UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Paul Raymond Ross )
    Prospective Plaintiff )
)
v. )
)
Kristin Dempsey, et al )
    Prospective Defendants )



MEMORANDUM OF LAW
SUPPORTING PLAINTIFF'S PROPOSED COMPLAINT

    Prospective plaintiff Paul Raymond Ross comes forth with this civil rights complaint to redress the Defendants' conspiracy to interfere with Mr. Ross's civil rights. This action is intended to uncover the conspiracy, which was engaged in for the furtherance of False Arrest, Abuse of Judicial Process, Tortious Interference of Contract, and Defammation against Mr. Ross. Mr. Ross seeks compensatory and punitive damages, as well as the initiation of a full criminal investigation against the defendants.

### JURISDICTION

1.    This is a civil action authorized by 42 U.S.C. § 1983, 1985 to redress the deprivation, under color of state law, by officials and private citizens, by way of conspiracy, of rights secured by the Constitution of the United States.

2.    The court has jurisdiction under 28 U.S.C.§1332, as a dispute between citizens of seperate states, and a controversy over the amount of $75,000. This action involved state actors and private citizens.

3.    The Northern District of New York is the proper venue under 28 U.S.C. § 1391(b)(2) because it is where the events giving rise to this claim occurred.

## PLAINTIFF

4. Paul Raymond Ross, at all times during the events of this action, was a citizen of New York State, in Binghamton, NY, unless otherwise specified as a federal custody inmate, pretrial detainee, or in community release ("RRC" or "Halfway House") during multiple periods from 2009 to 2016.

5. Plaintiff Ross's DOB is January 24, 1954, and is represented by BOP Inmate # 14753-052.

## DEFENDANTS

6. (D1) Kristin Dempsey O'Donnell is a citizen residing in Pennsylvania. She is the wife of D2 FBI Agent Thomas O'Donnell. D1 is the Vice President of Dempsey Uniform and Linen Supply.

7. (D2) FBI Agent Thomas O'Donnell is a resident of Pennsylvania, an employee of the federal government, and the husband of D1.

8. (D3) Dempsey Uniform and Linen Supply is a uniform rental business corporation chartered in Pennsylvania. The company operates four locations - three in Pennsylvania, and one in Maryland. D3 employ s approximately 300 persons, including President Patrick Dempsey, and Vice President D1.

9. (D4) James Greenwald is an Assistant Federal Public Defender ("AFPD") in Syracuse, NY. D4 represented Mr. Ross as defense counsel during the proceedings of Mr. Ross's criminal action from October 15, 2013 through sentencing on June 4, 2014.

10. ( D5) Federal Public Defender's Office in Syracuse, NY was assigned to Mr. Ross's criminal action. The Office's Head Federal Public Defender ("HFPD") is Alexander Bunin, supervisor to D4.

11. ( D6) Federal Probation Office in Syracuse, NY as headed by Senior United States Probation Officer Matthew Brown, is the USPO assigned to the Northern District of New York, and thus supervision of Mr. Ross.

12. (D7) Dorcas Brandon is a 50 year old female resident of New York State, and wife of citizen Lionel Brandon.

13. (D8) Craig Benedict is an Assistant United States Attorney ("AUSA") representing the federal government, in Syracuse, NY, for the Northern District of New York.

14. (D9) Thomas McAvoy is a Senior United States District Judge for the Northern District of New York, presiding over Mr. Ross's criminal action proceedings.

15. (D10) Robert Lyons is an FBI Agent based in Binghamton, NY, an employee of the federal government.

16. (D11) Paul Bokol is an FBI Agent based in Binghamton, NY, an employee of the federal government.

## STATEMENT OF FACTS
## 2004 - 2006

17. Michael Schapiro, owner of Schapiro Uniform Rental, pays Mr. Ross $800 per week for a "no show" job, to obtain invoices from his (Schapiro's) competitors. Documented on IRS 1099 Form.

18. Kristin Dempsey (D1) marries FBI Agent Thomas O'Donnell (D2) in 2005.

19. As Vice President of D3 Dempsey Uniform and Linen Supply, D1 Kristin Dempsey compsensates Mr. ross $10,000 to search through her competitor's refuse dumpsters with the intent of gathering invoices.

20. Mr. Ross was compensated by two seperate checks, totalling $7,500, executed by President Patrick Dempsey, of D3 Dempsey Uniform and Linen Supply.

21. One of the checks ($5000) was disguised as a non-compete agreement, for a business that Mr. Ross no longer operated. The NCA was against Uniform Management Company, and Mr. Ross, to last for his natural life.

- 3 -

22. Michael Schapiro permitted Mr. Ross to sell the invoices from Pennsylvania to D1 Kristin Dempsey. Schapior told investigators that he was aware of D1 Dempsey's invoice purchases from Mr. Ross.

23. FBI agents meet with Mr. Ross during an investigation against Mr. Schapiro.

24. Mr. Ross informs D1 Ms. Dempsey about the FBI's investigation.

25. D1 Dempsey and Mr. Ross meet at a "Denny's Restaurant" on Route 6 in Carbondale, then they move the meeting to a hotel room located nearby.

26. D1 Dempsey promises Mr. Ross $200,000 in exchange for not disclosing to the FBI about her role in the stolen invoices.

27. D1 Dempsey proceeds to destroy all of the stolen invoices.

28. Mr. Ross meets Stella McGovern from Ithaca, NY, via social media.

29. Ms. McGovern loans Mr. Ross $7,000 to purchase a car for his taxi business. The money is loaned on the condition that Dempsey will be paying Plaintiff $200,000 in the near future.

30. Stella McGovern calls in the loan for full repayment of $7,000.

31. Via two seperate email requests, McGovern asks D1 Dempsey for satisfaction of the loan repayment.

32. Mr. Ross becomes involved with D7 Dorcas Brandon, and the two discuss the $200,000 promise from D1 Dempsey. Ms. Brandon tells Mr. Ross several times that D1 Dempsey is lying, and will never pay the money.

33. Upon Mr. Ross's request for payment, D1 Dempsey refuses to comply.

34. Mr. Ross utilizes a third party in Africa to send D1 Dempsey demand emails.

35. D1 Kristin Dempsey informs husband D2 Thomas O'Donnell about the emails, who in turn contacts the FBI in New York.

36. The FBI arrests Mr. Ross for the "third party email threats".

37. During investigations, the FBI questions Schapiro on knowledge about D1 Ms. Dempsey for payment of the stolen invoices, to which Schapiro confirms.

38. D1 Dempsey denies all allegations of paying for the invoices, and the investigation into D1 Dempsey and Schapiro are dropped.

39. Schapiro's knowledge about D1 Dempsey's involvement in the same crime preclude charging Schapiro, and NOT D1 Dempsey.

## 2008 to 2010

40. Mr. Ross is convicted of Extortion by Threatening Communications in violation of 18 U.S.C. § 875(b).

41. New York State Trooper Scott Pauly contacts AFPD Lisa Peebles and AUSA Michael Olmstead regarding details about Mr. Ross's work with the New York State Police.

42. An error in Mr. Ross's Presentence Investigation Report ("PSR") classifies Mr. Ross as a Sex Offender. Upon request to correct the error, AFPD Lisa Peebles refuses to comply.

43. Classified as a sex offender, Mr. Ross is not permitted to self-surrender to incarceration, and is designated to LSCI Allenwood instead of a Minimum Security Camp.

44. Mr. Ross's immediate remand to custody disrupted the operation of his Taxi business, and subsequently the income generated from the business.

45. On May 5, 2015, Mr. Ross enters custody of RRC in Syracuse, NY.

46. Uppon communicating to USDJ Hurd that he will be initiating a civil suit against D1 Dempsey, Plaintiff is returned to prison on a violation of "Victim Contact"

2010 -- 2011

47. Mr. Ross is released from incarceration on September 9, 2010.

48. Upon recommendation from his court-ordered mental therapist, Mr. Ross maintains a thought and emotional journal.

49. USPO Mike Pierce encourages Mr. Ross to engage in "constructive activity" to facilitate Probation compliance. Mr. Ross decided to participate in and train at golf.

50. Mr. Ross demonstrates talent at the game of golf, and is offered a sponsorship to the Dick's Sporting Goods Open, contingent upon his qualification.

51. Mr. Ross begins a relationship with D7, Dorcas Brandon, who is aware of Mr. Ross's history and probation status.

52. USPO Mike Pierce informs Mr. Ross that he is being investigated upon a complaint by D7 Ms. Brandon, of having received threatening emails from Mr. Ross.

53. D7 Ms. Brandon's claims are investigated and determined to be unsubstantiated due to a lack of evidence of any harassment by phone or email. The investigation is concluded, no charges are filed, including none against D7 Brandon herself for providing false information to police.

2012 - 2013

54. Mr. Ross enters into an unstable relationship with a woman named "Maria Million" from Vestal, NY.

55. Mr. Ross maintains a social network Facebook page, which contains photos of firearms, which are set to "private", a parameter of security allowing only Mr. Ross's "Facebook Friends" to have access to view these photos.

57. Upon receiving a "Friend Request" from Mr. Ross, a "Rick Fish", as an ex-relation to Maria Million, files a report with the Vestal Police, believing that Mr. Ross's firearm images are a direct threat toward him.

58. The Vestal Police investigate and question Mr. Ross, and the investgation is concluded with no charges bein filed.

59. Mr. Ross's Facebook page is blocked.

60. Upon contact from the FBI, a detective representing Facebook continuously contacts Mr. Ross and his "Friends" / "Contacts".

61. During his compliant probation period, Mr. Ross develops a product, a board game titled "Real Life", and takes it all the way through prototype and initial production, including a marketing strategy and probmotion.

62. Mr. Ross secures investors for his endeavor, including an NYPD officer, and members from Mr. Ross's Church.

63. Mr. Ross becomes Treasurer of the Church's Board of Directors.


2013

64. Mr. Ross completes his term of Probation on September 9, 2013.

65. Upon the termination of his probation, Mr. Ross goes public, via Facebook, to expose the actions of The Defendants against him, and his desire to pursue a civil action.

66. Mr. Ross's Facebook profile contains a photograph of D1 Ms. Dempsey, to be used for the benefit of the process server tasked with delivering summons and complaint to her.

67. On October 15, 2013, FBI Agents arrest Mr. Ross on a charge of stalking and threatening D1 Ms. dempsey.

68. D1 Kristin Dempsey is not a "Facebook Friend" of Mr. Ross, and as such, would not have had access to any photographs, including weapons, that were published on Mr. Ross's Facebook page.

69. Mr. Ross's psr, as prepared by the USPO states that "Kristin Dempsey saw the gun images, downloaded them, and gave them to the FBI".

70. The images were downloaded by a computer in a federal building.

71. Mr. Ross is indicted on October 21, 2013 of Interstate Stalking, in violation of 18 U.S.C. § 2261A(2).

72. With the delivery of 5000 units of his finished board game only weeks away, Mr. Ross is remanded without bail by USDJ David Peebles to the custody of a county jail for nine months.

73. All units of the game, and all investment into the product are subsequently and unwillingly forfeited permanently.

74. Mr. Ross's counsel, D4 AFPD James Greenwald, during his representation of Mr. Ross, refused his client's requests to (1) File Motion to Supress Therapy Journals (see Paragraph 48), (2) advocate on Mr. Ross's behalf by arguing to expose the source of the gun images on Facebook, (3) Correct nine inaccurate entries in Mr. Ross's PSR.

75. D4 Greenwald provided Mr. Ross with faulty United States Sentencing Guideline information (USSG), and provided Mr. Ross's character witnesses with a false sentencing date, preventing their appearance, and precluding their testimony from MR. Ross's sentencing.

2014 - 2016

76. On June 4, 2014, Mr. Ross is convicted of 18 U.S.C. § 2261(A)2.

77. Mr. Ross is designated and transferred to LSCI Allenwood to serve his sentence of incarceration for the offense.

78. Allenwood SIS classifies Mr. Ross as a "sex offender" based upon the misrepresented information in the psr, resulting in denial of designation to a Minimum Security Camp, and denial of RRC Placement.

79. Mr. Ross, has been diligent, as a pro se litigant, in pursuing his legal recourse, as noted in paragraphs 80 through, 89 below.

80. November 2, 2014: Mr. Ross sent a letter to AFPD Lisa Peebles, outlining the unethical behavior of D4 AFPD Greenwald.

81. December 2: 2014: Mr. Ross sent a letter to sentencing Judge, D9, SUSDJ Thomas McAvoy regarding his concerns over being classified as a sex offender, despite, having never committed a sex related offense.

82. January 1: 2015: Mr. Ross sent a letter to the ACLU explaining his case, and soliciting help.

83. February 4: 2015: Mr. Ross sent a letter to the head of the Federal Public Defender's Office about the intentional lies in his PSR.

84. April 14, 2015: Mr. Ross sent a letter to AFPD Lisa Peebles concerning her efforts in restricting Mr. Ross access to his PSR.

85. April 21, 2015: Mr. Ross sent a letter to D5 Head Federal Public Defender addressing the behavior of AFPD Lisa Peebles and D4 James Greenwald.

86. June 2, 2015: Mr. Ross contacted D9 SUSDJ McAvoy regarding a judicial conspiracy with D5 Federal Defender's office.

87. July 20, 2015: Mr. Ross contacts AUSA Carl Eurenius regarding the government's argument to his 2255 motion.

88. November 17, 2015: Mr. Ross sent a letter to US Attorney Richard Hartunian, requesting a full investigation.

89. November 30, 2015, Mr. Ross sent a letter to AG Lorettta Lynch, requesting an investigation.

90. Mr. Ross is released from incarceration on March 8, 2015.

- 9 -

## CONSPIRACY TO VIOLATE MR. ROSS'S CIVIL RIGHTS

91.     The gravamen of this action is founded upon the exposure of the conspiracy committed by Defendants D1 through D11, that violated Mr. Ross's civil rights. As discussed below, the Defendants acted in collusion, concurrently, and through aggregate individual actions in a multi-layered conspiracy which resulted in Mr. Ross's unlawful conviction and incarceration. Mr. Ross suffered the untimely termination of his business (including revenue and income) à forfeit of investments and inventory, a lost sponsorship, and loss of liberty, at the benefit of the Defendants' own interests, including prosecutorial immunity, concealment of criminal activity, vindicication, and economic gain.

92.     42 U.S.C.§1985(3) prohibits (1) Conspiracies (2) For the purpose of depriving any person equal protection of the laws by (3) Committing acts in furtherance of the conspiracy, (4) Wherby a person is injured in his person or property or deprived of a right or privilege of a citizen.

93.     See Martinez v. City of Suffolk 999 F.Supp 2d 424 (EDNY 2014) and Thomas v. Roach 165 F.3d 137, 164 (2nd Cir. 1999) as the Second Circuit and Eastern District of New York's holdings for the standard of review of Civil Conspiracies.

94.     The most egregious indicator of a conspiracy lies in the fact that D1 Ms. Dempsey and D3 Dempsey Uniform were culpable for a serious offense, namely the purchase and use of stolen invoices for pecuniary gain (¶18). D1 Ms. Dempsey is conveniently the spouse of of D2 FBI Agent Thomas O'Donnell, who's coverup actions and deliberate omissions implicated the other Defendants, (D10, and D11 principally), to ultimately protect his wife, D1 Kristin Dempsey from exposure and prosecution (¶¶35-39).

95.     Mr. Ross became the patsy, the fall guy in this conspiracy that lead to his prosecution. The abuse of the justice system included the collusion by way of "Personal Involvement" of private citizens, Corporation D3 Dempsey Uniform and D7 Dorcas Brandon, D4 Defense Counsel AFPD James Greenwald and D5 Federal Public Defender's Office, D6 USPO, D8 The Prosecutor, and D9 SUSDJ McAvoy. See Liner v. Fischer WL 4405539 (SDNY 2013).

96.   D1 Ms. Dempsey not only engaged in illegal and unethical business practices (¶¶20-21) by compsensating for and utilizing stolen invoices for her economic gain, she also obstructed justice by lyin to the FBI about her involvement in the scheme (¶¶26-27). D1 Ms Dempsey also denied the $200,000 in "hush money", and DESTROYED EVIDENCE to conceal her's and D3 Dempsey Uniform's involvement in the stolen invoice incident.

97.   D7 Ms. Brandon provided false testimony to Broome County investigators concerning purported "disturbing emails" and to USPO Mike Pierce alleging harrassing phone calls, with the intent of implicating MR. Ross in futherance of the conspiracy.

98.   FBI Agents D2 O'Donnell, D10 Lyons, and D11 Bokol took advantage of the situation of a "perceived threat" (¶¶66-67), contained in Mr. Ross's first-amendment-protected Facebook profile (See Elonis v. United States 135 S. Ct. 2001 (2015), Facebook postings absent a "clear and imminent threat" are protected speech). The Agents fabricated a situation where D1. Ms. Dempsey "downloaded" the images, an event which never occurred, as they were proven downloaded by a government owned and operated system (¶69).

99.   As discussed in further claims below, throughout both indictments and proceedings against Mr. Ross, D9 SUSDJ McAvoy knew of and allowed the collusion between D4 and D5 collectively with D8 United States Attorney's Office (¶74), all of whom acted in "bad faith" for "improper motives" to conceal the illegal acts, and the conspiracy itself throughout the prosecution of Mr. Ross. Quoting United States v. Martinez 816 F.Supp 644 (D.Org. 1993).

## MALICIOUS ABUSE OF PROCESS

100.   A malicious abuse of process claim "lies against a defendant who (1) employs regularly issued legal processes to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification (3) in order to obtain a collateral objective that is outside the legitmate ends of the process" See Savino v. City of New York  331 F.3d 63 (2nd Cir 2003), quoting the elements and standard of review under leading case Cook v. Sheldon 41 F.3d 73, 80 (2nd Cir 1994).

101.  When D2 FBI Agent Thomas O'Donnell became aware of his wife D1 Ms. Dempsey's and D3 Dempsey Uniform's criminal activity which profited both D1 and D3, he developed the conspiracy to protect his wife.

102.  D2 Agent O'Donnell's conspiracy eventually involved two additional FBI Agents, D10 Lyons and D11 Bokol in furtherance of the conspiracy during investigation phases (¶¶20-21).

103.  Agents D2, D10, D11's actions were beyond the scope and authority granted to them as Federal Investigators, utilizing their role in criminal investigations / prosecution for an "improper purpose", outside the legitimate ends of the process.  See Antes v. Bomura 10-CV-5472 (SDNY 2013).

104.  D10 Agent Lyons and D11 Agent Bokol were able to secure an illegal search warrant, predicated on false evidence and testimony regarding D1 Ms. Dempsey's "receipt of threatening images", a fact which NEVER occurred (¶¶66-69), leading to Mr. Ross's indictment.

105.  D4 AFPD James Greenwald, at the direction of his Office, D5, engaged in more than mere cooperation with the Federal Government D8 AUSA Craig Benedict, but utterly failed as effective counsel by acting on orders from D8 US Attorney's Office in furtherance of the conspiracy.

106.  Upon Mr. Ross's arrest for the stalking charge, he appeared before USDJ David Peebles.  His Honor is a purported (ex?) relation with Lisa Peebles, AFPD of D5 Defender's Office, a further indicator of blatant cronyism to the detriment of Mr. Ross.  USDJ Peebles was also presiding over Mr. Ross's at-the-time civil action against D1 Ms. Dempsey, in conflict of interest.

107.  The collusion between The D8 United States Attorney's Office, The Court, with D5 The Federal Defender's Office, dates back to September 9, 2008, when defense counsel failed to object to AUSA Michael Olmstead's fraudulent statements made to USDJ David Hurd, in order to prevent Mr. Ross from receiving a mitigated sentence.

108.    Counsel D4 AFPD James Greenwald made several omissions in his representation of Mr. Ross (¶74) and even went so far as to WILLFULLY contact Mr. Ross's character witnesses to prevent their appearance at his sentencing to present mitigating testimony (¶75), an order originating from either The D8 Attorney's Office and/or D9 SUSDJ McAvoy.

109.    D6 Federal Probation Office, the compiler of Mr. Ross's PSR, deliberately allowed false information to be published, and refused to correct or investigate the misrepresentation when an objection was raised by Mr. Ross HIMSELF (¶42).

110.    D8 AUSA of Syracuse Craig Benedit, at the direction of D8 Head US Attorney Hartunian, futhered the conspiracy against Mr. Ross with the deliberate witholding of evidence, concealment, and relying on misleading testimony, all of which qualify as the "intentional abuse of the prosecutorial function", an exception to absolute prosecutorial immunity under Hilliard v. Williams 516 F.2d 1344 (6th Cir 1975).

111.    D9 SUSDJ Thomas McAvoy was fully cognizant of the entire conspiracy, including the overt collusion between D4 / D5 Mr. Ross's Defense counsel with D8 The United States Attorney's Office.

112.    Apart from this willful omission, D9 SUSDJ McAvoy demonstrated bias and prejudice against Mr. Ross by directing Courtroom Deputy C.M. Ligas to send a letter to Mr. Ross's character witnesses in an attempt to cover D4 AFPD Greenwald's actions (¶108).

113.    D9 USDJ McAvoy knew of the lies of D1 Dempsey, including the one regarding the downloaded gun images, and furthermore, did not object to USDJ Hurd's threat that Mr. Ross would face prosecutorial consequences for engaging in said civil suit against Ms. Dempsey.

114.    The actions and omissions of D9 SUSDJ McAvoy could easily fall under the Hilliard immunity exception as his conduct was "so fundamentally unfair" as to deprive Mr. Ross of "...constitutional right to due process". See also Reid v. Phillips WL 1920218 (SDNY 2004).

## TORTIOUS INTERFERENCE OF CONTRACT

115.    Under New York State law, which the District Courts defer to in actions of diversity controversies over $75,000, the Defendants' are liable to Mr. Ross for tortious interference of contract.

116.    The Second Circuit applies the standard of Albert v. Loksen 239 F.3d 256 (2nd Cir. 2001) in its determination of a breach of contract tort.

117.    Mr. Ross operated a taxi business that was disrupted immediately upon his denial of bail / release on indictment in 2013 (¶72).

118.    Mr. Ross lost the investment and delivery of his entrepreneurial endeavor upon his untimely remand, forfeiting all development, costs, and inventory in his product, board game "Real Life" (¶73).

119.    While being detained without bail, Mr. Ross was unable to comply with his contingent sponsorship for competition and qualification in the Dicks Sporting Good Open Golf Tournament (¶49).

120.    "The Breach" and termination of the above contracts "would not have occurred" but for the knowing, vindictive, and collusive conduct of the Defendants. (Emphasis added) See Sharma v. Skarrup Ship Mgmt Corp 916 F.2d 870 (2nd Cir 1990).

## DEFAMATION

121.    Mr. Ross suffered irreperable injuries to his career, reputation and standing due to the defendants' written / verbal derogatory and false claims.

112.    D7 Ms. Brandon made false statements regarding an alleged incident of harrasment by Mr. Ross (¶53) combined with Ms. Dempsey's false claim of a "threatening letter" led to Mr. Ross's immediate remand upon indictment.

123.    Mr. Ross's remand cuased the untimely disruption of his taxi service and his source of revenue / income. Mr. Ross also lost the contingent Dick's Sporting Goods Open Sponsorship (¶71-73), all inventory / investments into his

"Real Life" board game. All injuries to his "Tangible interests" were the direct result of the false claims against him. See Segal v. City of New York 459 F.3d 207 (2nd Cir. 2006).

124.  In addition to his forfeited tangible interests, Mr. Ross is now a convicted felon and precluded from engaging in his longtime pleasure in sport shooting and hunting. He maintains a "stigma plus" claim in this liberty interest under Patterson v. City of Utica 370 F.3d 322 (2nd Cir. 2004).

REQUEST FOR RELIEF

WHEREFORE, Mr. Ross Respectfully prays that the court enter judgment:

125.  Granting Mr. Ross a declaration that the acts, omissions, and concealments of the Defendants' described herein violated his rights under the Constitution and laws of the United States.

126.  Granting Mr. Ross actual, compensatory, and punitive damages in the amount of Ten Million ($10,000,000) USD for false imprisonment, loss of liberty and property interests, committed knowingly by the Defendants, and entered - against the Defendants' jointly and severally.

127.  The initiation of a criminal investigation against all defendants, insofar as their actions and ommissions correspond, for Comspiracy, False Claims, Abuse of Process, Obstruction of Justice, Tampering Evidence / Witnessess, Perjury, Restraint of Trade, and any other statutory violation occurring.

128.  Mr. Ross requests a jury trial on all issues triable by a jury.

129.  Mr. Ross seeks recovery of all costs in the action, including reasonable attorney's fees.

130.  Any additional relief the court deems just, proper, and equitable.